162023, Rachel Cullinane et al. v. Uber Technologies, Inc. Thank you, Your Honor. May it please the Court, Matthew Wessler for the appellants. With the Court's permission, I'd like to reserve three minutes for rebuttal. You may. This case brings us to the far outer edge of what constitutes a contract under traditional principles of contract law. Since the days of Williston and Corbin, it has been the settled rule that the touchstone of a contract is clear and unambiguous assent by both parties to be bound to the agreed-upon terms. In the context of paper contracts, that assent was not difficult to secure. A written signature was enough because the act of affirmatively signing one's name to a piece of paper unambiguously conveys objective evidence of acceptance. The question here is what is required when a company opts to leave the written signature or anything resembling it behind. Although Uber affords its drivers the opportunity to unambiguously manifest their assent to binding contractual terms and conditions, by twice requiring the driver to click I agree after reviewing the terms, it asks this Court to treat its choice to deny riders that same opportunity as legally insignificant. But that choice should have consequences. Although the difference might seem small, the line between positive and unambiguous assent in something less is the very line that defines what can credibly be called a contract under principles of Anglo-American law. My question has to do with exactly what factual record we're working with here. We do have screenshots, as I understand it, of what the consumer would see. That's correct. In looking at the screenshots and asking is this reasonably conspicuous, it seems to me at that point I need to have some knowledge about what expectations and conventions are from the consumer's perspective, from the industry perspective. Because if you know that most of the time something is done a certain way, then a failure to do it that way might be a way of making something not conspicuous in other ways. Where do we get the factual knowledge that we would need to say something about conventions and expectations? You know, that's a good question. I'll try to answer your question two ways. One, as a matter of custom, the way that other courts have evaluated that question is to avoid having to inject expert testimony about what a reasonably prudent consumer might expect or understand when faced with a screen. Every case that has been cited by both sides on this question, the court itself has treated that question as a question of law to be determined based on the facts and circumstances presented to the judge or the panel as to the design and functioning features of the particular screen. Let me give you a specific example, okay. Everybody now uses smart phones and uses things, and I think it's fair to say some of us have an expectation. Are you very used to seeing something in blue and underlined, and you kind of know right away that's a link. If you hit it, something's going to happen. Well, that's what I know from what I do. How do I know whether that's what most consumers in your class would expect or would not expect? I think it's an inference that one would draw, and I don't think there's any doubt, at least it's not contested here, that a reasonably prudent smart phone user, which I think is the standard that we're all grappling with, would understand an underlined blue font term or phrase to be considered a hyperlink. I think that where we are in this case is really less about the hyperlink piece of the screen and more about whether a reasonably prudent user would have conspicuous notice that taking some affirmative act would bind them to certain terms and conditions. Now, I think you could engage if your honors felt that that question turned on understanding at a more detailed level what a reasonable expectation would be. If a consumer could remand this case back down for an evidentiary trial that would include or encompass expert testimony about how consumers' or users' eyes toggle up and down between screens, what consumers typically understand and focus on when thinking about whether they are binding themselves to a particular contract. Another question that has come up in these cases is whether entering credit card information somehow leads the consumer to believe that the only purpose of a particular page is to enter that information, but then later they will be afforded an opportunity to review terms. Those are fact questions, and we think that a remand here could open up the opportunity to do what Judge Whitlock refused to do below, which was to engage in that kind of fact-intensive analysis. Suppose that shows that 95% of consumers, no matter how conspicuous it is, never look at the terms and conditions, and of the 5% that look at them, there are like six people in the United States who have actually read them. Right. Of what significance is that? So that does not have legal significance, and I don't think that it is the view of the law, of contract law, as a matter of electronic bargaining or as a matter of long-standing paper bargaining, that the duty to read is somehow dispositive and eliminates or lowers the bar for the formal requirements that are necessary before a contract can be formed. There is a floor here, and if you sort of try to tease out the theme that I think is running through the several dozen cases that exist analyzing this question, I think the one theme that runs through them is that the floor is some evidence of unambiguous assent. It shouldn't matter, and it doesn't matter whether consumers read or don't read the terms, because what's required ultimately is something resembling a signature, some affirmative act that courts can look at and understand as, I affirmatively accept those terms whether or not I've actually read them. And that floor here just doesn't exist. There's not a single case in the country, Uber hasn't cited one, and we've looked and we have not found one that has relaxed that requirement, the requirement for affirmative assent to the point where what Uber's screen looks like for riders could qualify under that settled understanding of assent. And I think that at stake here really is a basic view of the way in which contracts can credibly be formed in the electronic bargaining process. Counsel, I'm sorry. Suppose the screen was the same, but instead of hitting something that says done, it would say I agree. Would that satisfy? Yes, we think that would satisfy. And there's a fundamental difference between what Your Honor just suggested and what we have here. Most courts have looked at I agree click boxes, for instance, or buttons, and they've said that term coupled with warning language, that clicking the stating explicitly, that clicking the I agree button constitutes acceptance of certain terms, is evidence of unambiguous assent. But what happened here is something below even that level. There is no click box that requires a user to do what drivers are required to do. I agree that I've reviewed these terms and I accept them, click the box. There's nothing like that. There's not even a button that says I agree to these terms. All you have is a button that says done, and that button is not spatially coupled. In other words, it's not in any physical proximity to the language that Uber used in this screen, which is not by clicking this button you have agreed to these terms. It's something that says by creating an agreement you have agreed to those terms. And there isn't a court anywhere that has lowered the bar below the floor that Your Honor just suggested, which is requiring some affirmative, positive evidence of agreement in the form of either a check box that says I agree or a button that says I agree. Unless the court has further questions, I'll reserve the rest of my time for rebuttal. I think your answer, Judge Thompson, was actually that the box is not enough if it said I agree, unless there is some associational reference with what it is you're agreeing to. Thank you, Judge Kellman. That's correct. If there's a box with a check mark, that box needs to signal to the user specifically what that check actually means. If it's a button, which I may have understood what Judge Thompson is suggesting, a button instead of a box, nevertheless that button must be coupled in some physical proximity with language explicitly telling the user that the clicking of that box signifies their acceptance of the terms or agreement. Thank you, Your Honor. Good morning. May it please the Court. My name is Elaine McChesty. I'm representing the Appellee Uber Technologies. With me today are my colleagues, Lawrence Stanley and Emma Hall. And what I would first like to address is the fact that this is actually an attack on arbitration. And if you look at question number two in the plaintiff's appellant's brief, the question is whether an arbitration clause in an online contract needs to be more conspicuous or called out. Obviously, that is preempted. And the First Circuit, far from this being a novel concept, has actually ruled on that in the securities litigation case that we cite. Well, I think we're familiar with the law that says we can't give specially unfavored treatment to the arbitration clause. I think that's a given, yes. There is some suggestion of some overreaching on that. But I do think the thrust of the plaintiff's argument, as I understand it, is that whole terms and conditions is not binding on the plaintiff's because your client did not provide reasonably conspicuous indication to the user that they were agreeing to any of the terms and conditions. Okay. Thank you, Your Honor. Yes, indeed, the very first complaint filed by the claimants alleged to breach that very contract that they now say did not exist, that in their complaint... I mean, you complained in the alternative. So I think sooner or later you're going to need to get around to addressing at least what I understand their argument is or tell me that they didn't make that argument at all. No. They only made that argument after we moved to compel arbitration. So what I would like to address are the particular points that they do say why this is not sufficient. First, they also make a point that this is a contract of adhesion and that there is somehow a higher standard of notice in a contract of adhesion for online contracts. That case was answered or that question was resolved by this Court in the Rosenberg decision, which said even a contract of adhesion will be enforced even if it contains an arbitration clause, citing mass law. But they're saying that there was no mutuality here because the terms and conditions weren't conspicuously noticed to them, such that it would have taken them to the specifics of the terms and conditions so that they would have assented to them. Okay. I would like to address that very particularly because under mass law, all that is required is that it is reasonably conspicuous or noticeable or that it has been communicated. So how was this reasonably conspicuous? Okay. First, the plaintiffs had to create an account. The very first screen in the process says create an account. The third screen says right in the middle of the screen, if you create an account, by creating an account, you are agreeing to the terms and conditions. There is a box around it. It's in different font. It is in different color. And that is, as a matter of law, conspicuous under Massachusetts law. Does the color of the box matter? Because it's certainly more difficult to read using the gray. I mean, it doesn't draw your eye to something that is the heart of the agreement between the parties for sure. And it comes underneath the input of credit card information. Okay. With respect to that, it is exactly in the center of the page where your eye is drawn. The bottom half of the screen is the keypad. Now, they've talked about proximity. They have alleged, although there was no evidence in the record below, that they had three and a half inch screens. So as a matter of just fact and logic, it had to be no more than an inch and a half away. Help us with this. What possible reason could your client have had for labeling the button done, which to me suggests I'm done putting in my credit card rather than I agree, and then putting in the tiniest little font. I assume none of your drivers are over 60 or users. The tiniest little font, the reference that by agreeing to this, and it's not near the button that you're agreeing to the terms of the condition, and then not underlying, which as I understand it is a common convention for getting to the terms and conditions. It kind of looks like somebody knowing how to direct people to something, trying to come up with a way to make it very unlikely that anyone would ever get there. Let me just tack on to the end of that. Particularly when you require your drivers to do something a lot more specific, so that if their contract came before this court, it would be undoubtedly a contract, because they specifically have to agree. The first answer to that is we are dealing with two different contracts, and the fact that one contract may be more specific is not an indication that the other contract is insufficient. Secondly, with respect to employment cases. But it is evidence that Uber is well aware of how to make it more conspicuous for a consumer. With all due respect, if you put 50 lawyers and even 50 judges in a room and said, can you make this more conspicuous, we would all find a way to do it. No, but we know that the industry has no problem at all having very many ways to make it sure I can't possibly miss an ad in the program. You can't even find the little X to turn off the ad. All right, but then we see, I assume all of us on experience see, a common way of getting to links, and your client chose not to do that. At the same time that it shows it knows the convention when it's dealing with the driver side of the transaction, it really looks kind of suspicious. Okay, well, I would disagree that there is a convention. There's no evidence anywhere in the record that there is a convention that everyone does it the same way. Well, there's evidence that your party that drew up the contract unilaterally, and therefore we might construe it, any ambiguities against it, that your client simultaneously was driving up a contract where it really wanted to make sure the drivers were bound because it wanted to make sure they weren't employees, so there it puts the I agree button and there's no way you can miss it. What about that convention? With a double I agree for the drivers. Okay, you have to also understand that in the context of employment and arbitration, there is a long line of case law now largely discredited by the Supreme Court, but nonetheless still out there about vindication of statutory rights, including civil rights under the employment statutes, basically. So? So you, in dealing with employment contracts, you are going to find a very different circumstance than you do with consumers. So, in other words, you really wanted to make sure the drivers got there and agreed? Not necessarily. I'm just saying there are different legal considerations that go into effect. I think we're going to the points you just made. Where was that logic going, if not otherwise, than to tell us that because of these laws with employment situation and stuff, it was really in your client's interest to make sure they agreed, from which I would draw an inference that your client decided it wasn't in its interest to make sure that the users agreed. Well, I would disagree that it was really in the client's interest. I think it would be in everyone's interest on the employment side. With respect to the consumer contracts, different standards apply to consumers, and we enforce written contracts of adhesion constantly. There is no dispute about that. And people may disagree as to whether that's a good idea, but nonetheless, that is the law. We have cited numerous cases in our brief. The issue is not whether it's a contract of adhesion. It's a question of whether the contract, whether the consumer received fair notice of the terms of the contract, whether it's an adhesion contract or not. Well, I think that was when adhesion contract law first started, that was the very issue with adhesion contracts. Was it giving sufficient notice? Now, as I said, we've cited in our brief numerous cases where I thought adhesion contracts had to do with unfair bargaining. Both. Both. Yes, Your Honor, both. And there are numerous cases where the button does not need to say I agree. If I sign a contract, a written contract, I do not have to sign a statement saying I agree or check off a box as long as my acceptance is clear. Counsel, in that example, you actually have a contract sitting in front of you. So you've found it. The problem is did the consumers ever have a contract sitting in front of them? Much less did they agree to it. Okay, well, I would respectfully suggest it is in the middle of the page. There are even cases, browse-wrap cases, where the hyperlink and the JavaScript It's in the middle of a page where the consumer is inputting their financial information. And if they next have to hit done, it seems like it is equally reasonable for a consumer to think, okay, the done means I've correctly inputted my credit card information or my banking information. I would respectfully disagree because that is not taking into account the transactional context here. The only purpose for inputting that information was to create an account. That was the entire purpose of everything plaintiffs did, and they have never disputed that. The very first screen says create an account. And that statement says if you create an account, you are bound. But you can want to create an account and then actually create an account once you have gotten all of the information that you need in order to determine if you're agreeing to the terms and conditions. So creating an account is setting up an account.  I would respectfully disagree, and I would also suggest that on this page there are only 26 words. 16 of them are the statement. Can you help me with how it works physically? As I understand the page, at the top, I input my credit card number. That's the first thing. And like most people, I usually start reading from the top down. So I put in my credit card number. But as I go down, isn't the very next thing that I see is a button that says done? No. You put in the credit card information, and the next steps down is by creating your account, you are agreeing to the terms, and underneath that is the keyboard with the numbers. The done button is in the upper right-hand corner. It is grayed out until the information is filled. So the done button is physically located on the page near the credit card input. And near the statement. It's at the top. It's at the top, and it's this much space. So it is very close in terms of proximity. You cannot miss it. And in fact, when that bold statement comes up, terms and conditions, signifying you should click on it, there is a button in the left-hand corner that says cancel. And that goes to your point, Your Honor, about, well, maybe I didn't want to create an account. A reasonable consumer, when presented with something that says terms and conditions, should read it. If they read it and don't like the conditions, they had the ability to cancel before they went through with the transaction and the account creation was complete. So does the cancel button come up only if the consumer has clicked on terms and conditions? No, the cancel button is there and they can cancel. So it says done and cancel? At the top left, it says cancel. The top right says done. Which again, it seems to be a binary choice implying to the consumer that they have a choice to go ahead and create the account and accept the terms and conditions. I will also point out that they've talked about how this is fact intensive. They did not submit any declarations below. There is no dispute about what the screens say. They talked about a possible remand to the judge. When we had oral argument, as is contained in the transcript in the appendix, I was the one who suggested to Judge Woodlock that if he thought there were a factual dispute, that we should have the trial under the FAA. And the plaintiffs did not submit any additional affidavits after that. They did not request a trial. And they have said that this is a decision to be made as a matter of law, which it is, when the facts of creation are undisputed. Now, they have also said that no other case in the country has held that this is sufficient. That is absolutely incorrect. In fact, there are three Uber cases involving this very agreement, two of which, the Cambria case, the Kubria case that we cite in our brief, have the exact same layout and were said to be not only conspicuous, but also to have been unambiguously accepted. The Meyer case, which the Second Circuit recently decided, has a similar layout, only it was done on a Galaxy Android platform. And the Second Circuit also said that pressing done, just because it serves a dual function, does not mean that it is ambiguous in any way. So every court, in fact, that has considered this very layout for the riders, not for the drivers, for the riders, has agreed that this is an acceptable way of creating assent and creating a contract. And I would respectfully suggest that Judge Woodlock did, in fact, examine the facts below and made the right decision, and it should be affirmed. Thank you. Thank you. Just a few quick points, Your Honors. Just to be clear, the notice language on this screen, and the version of the screen is at JA40, it's also in our opening brief at pages 8 and 34, is not directly above, directly above, below, or immediately adjacent to the done button. As Judge Thompson pointed out, the done button is in the upper right-hand corner of the screen. The notice language is in the middle of the screen, not spatially coupled with the button, or any button for that matter. And that, we think, is dispositive. Even in the Mayer case, which is the Second Circuit's recent decision involving a similar version. So if we can be precise and clear, because the counsel's answer confused me on that. As I understand it, if you start reading down the page from the top, you get to the done button before you get to the terms and conditions. That's correct. The done button is immediately adjacent to the open space where you enter your credit card information. And if you hit that done button, you're done. That's correct. That's it. Even if you hadn't kept things cryptic. That's correct. The Mayer case from the Second Circuit is a case that counsel suggested supports Judge Woodlock's decision. There are two crucial distinctions that exist between what's going on here and what happened there. The first is that the button in the Uber app at issue in Mayer is not a done button, actually. It's a register button. It says register. That's a significant difference. And courts have looked at the affirmative conduct that can be inferred from the use of the word register. And they've said that could supply unambiguous consent, even if it doesn't say I agree. We don't have that button here. But the other more important distinction, the distinction that we still haven't heard any answer from opposing counsel about why it's okay for Uber to relax this requirement, is that in the Mayer case, that register button was in close physical proximity. I'm quoting the Second Circuit. Close physical proximity with the warning text telling the user that creating an account will bind them to terms and conditions. The button register was not where the done button is in our screen. It was down below. You could not click it without moving your eyes, Judge Cayetta, down below the space for entering the credit card information, and it was directly above the actual warning language. It's that floor, that requirement of unambiguous assent, that we don't have here. And I think the concession that you heard from opposing counsel, that they know how to do it in the employment context, and the only reason it's okay to relax those requirements in the consumer context is because somehow the rules are different. That's obviously not true as a matter of law. But second of all, it does suggest that Uber's goal here is to slide riders into these agreements without getting their affirmative assent to the terms. The more times that they can get a user to seamlessly agree to an account, the more opportunity they have to increase their share. And that, we suggest, is error, and is why this Court should reverse. Thank you, Your Honors. Thank you.